**UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| M.F., a minor, by and through his parent and natural guardian YELENA FERRER; M.R., a minor, by and through her parent and natural guardian JOCELYNE ROJAS; I.F., a minor, by and through her parent and natural guardian JENNIFER FOX, on behalf of themselves and a class of those similarly situated; and THE AMERICAN DIABETES ASSOCIATION, a nonprofit organization, | No.  18-CV-6109<br><br>**COMPLAINT** |

Plaintiffs,

-against-

THE NEW YORK CITY DEPARTMENT OF
EDUCATION; THE NEW YORK CITY
DEPARTMENT OF HEALTH AND
MENTAL HYGIENE; THE OFFICE OF
SCHOOL HEALTH; THE CITY OF NEW
YORK; BILL DE BLASIO, in his official
capacity as Mayor of New York City;
RICHARD A.  CARRANZA, in his official
capacity as Chancellor of the New York City
Department of Education; OXIRIS
BARBOT, in her official capacity as Acting
Commissioner of the New York City
Department of Health and Mental Hygiene;
and ROGER PLATT, in his official capacity
as Chief Executive Officer of the Office of
School Health,

Defendants.

## INTRODUCTION

1.    This class action lawsuit challenges the New York City Department of Education's

and the above-named Defendants' (collectively, "DOE" or "Defendants") ongoing and systemic

failure to provide appropriate care to students with type 1 diabetes ("diabetes") in New York City

1

public schools, in violation of these students' civil rights and resulting in short- and long-term harm.

2.      DOE consistently fails to put necessary services in place at the start of the school year for students with diabetes. Despite parental efforts, it can take days, weeks, or even months before students with diabetes can safely attend school and school-sponsored activities without their parents also attending because schools routinely fail to hold Section 504 meetings and implement and finalize Section 504 plans before the start of the school year, as the law and DOE's own regulations require them to do.

3.      DOE's failures burden parents and guardians who must report to school, often multiple times a day, to provide the medical care that DOE does not provide, including testing blood glucose levels and administering insulin.

4.      DOE places very young children, particularly four- and five-year-olds entering the school system for the first time, in danger by routinely failing to sufficiently monitor students' blood glucose levels and failing to respond appropriately to hypoglycemia and hyperglycemia. Young children, whether their diagnosis is new or not, are often unable to recognize the symptoms of these conditions on their own. Yet, teachers, paraprofessionals, and even nursing staff are frequently not trained or undertrained to recognize these potentially life-threatening symptoms.

5.      In addition to the lack of appropriately trained personnel, DOE segregates and stigmatizes students with diabetes and requires students to miss important educational time. DOE forces students with diabetes to leave class multiple times a day to receive routine and necessary diabetes care without analyzing whether that care should be provided in the student's classroom based on the student's individual circumstances.

6.      DOE also excludes children with diabetes from important educational opportunities. Because DOE fails to provide them with necessary medical care specifically laid out in medical orders their doctors submit to DOE, students with diabetes are regularly prevented from participation in field trips taken during the school day and participation in before and after-school activities including school breakfast, after-school care, and school bus transportation. At other times, students with diabetes can attend only if they have the resources to provide their own medical care at parent expense.

7.      These DOE failures affect a large group of students. There are at least 2,000 students with diabetes – which qualifies as a disability under the law – attending DOE schools.

8.      Schools are required to provide these students with a medically safe environment at school as well as a free appropriate public education ("FAPE") and equal access to all the programs and activities of that school. Yet DOE's policies, practices, and procedures related to diabetes care fail to meet these legally required standards.

9.      Laws protecting children with disabilities were enacted to prevent discrimination like this. DOE denies Plaintiffs their rights in violation of Section 504 of the Rehabilitation Act of 1973 ("Section 504"), the Americans with Disabilities Act ("ADA"), and the New York City Human Rights Law ("NYCHRL").

10.     The American Diabetes Association (the "Association")  and the students named as Plaintiffs and representing the putative class seek declaratory and injunctive systemic relief in the form of an order finding Defendants out of compliance with relevant education and discrimination laws and directing Defendants to make systemic reforms to their policies, practices, and procedures regarding diabetes care in order to provide FAPE and equal access to education for all students with diabetes attending DOE schools.

## JURISDICTION

11.     Plaintiffs bring claims under Section 504, 29 U.S.C. § 794; Title II of the ADA, 42 U.S.C. § 12101 *et seq.*; and the NYCHRL, N.Y.C. Admin. Code § 8-101 *et seq.*

12.     This Court has subject matter jurisdiction over the action pursuant to 28 U.S.C. §§ 1331, 1343(a)(3), and 1343(a)(4) as this is a civil action arising under the laws of the United States. This Court has jurisdiction over the supplemental claims arising under New York City law pursuant to 28 U.S.C. § 1367(a). Moreover, this Court has jurisdiction to issue a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202.

## VENUE

13.     Pursuant to 28 U.S.C. § 1391(b), venue is proper in this District because one or more of the parties are located within this District. Moreover, a substantial part of the events or omissions giving rise to the claims alleged herein occurred in this District.

## PARTIES

14.     Plaintiff M.F. is four years old and is a resident of Manhattan. At the time of filing, he attends a public school located in Manhattan. His next friend is his mother, Yelena Ferrer. Ms. Ferrer is a member of the American Diabetes Association.

15.     M.F. has been diagnosed with type 1 diabetes. This impairment substantially limits one or more major life activities of eating and caring for oneself, and the operation of his endocrine system, making him an individual with a disability for the purposes of Section 504 and the ADA. At the time of filing, M.F. is a pre-school student at a DOE public school and, as such, is qualified to participate in the programs, services, and activities of DOE.

16.     M.F. has been denied the diabetes care he needs to attend school and would have been excluded from school-related activities if his parent had not provided care. M.F. unnecessarily missed class time during the current school year solely because of his diabetes,

and, absent court intervention, will continue to unnecessarily miss school and class time unless his parent attends with him because of Defendants' failure to follow Section 504 for routine and necessary diabetes care.

17.     Plaintiff M.R. is five years old and is a resident of Brooklyn. At the time of filing, she attends a public school located in Brooklyn. Her next friend is her mother, Jocelyne Rojas. Ms. Rojas is a member of the American Diabetes Association.

18.     M.R. has been diagnosed with type 1 diabetes. This impairment substantially limits one or more major life activities of eating and caring for oneself, and the operation of her endocrine system, making her an individual with a disability for the purposes of Section 504 and the ADA. At the time of filing, M.R. is a kindergarten student at a DOE public school and, as such, is qualified to participate in the programs, services, and activities of DOE.

19.     M.R. has been denied the diabetes care she needs to attend school without a family member providing care. M.R. unnecessarily missed class time during the current school year solely because of her diabetes, and, absent court intervention, will continue to unnecessarily miss class time and school-related activities because of Defendants' failure to follow Section 504 for routine and necessary diabetes care.

20.     Plaintiff I.F. is seven years old and is a resident of the Bronx. At the time of filing, she attends a public school located in Manhattan. Her next friend is her mother, Jennifer "Jaye" Fox. Ms. Fox is a member of the American Diabetes Association.

21.     I.F. has been diagnosed with type 1 diabetes. This impairment substantially limits one or more major life activities of eating and caring for oneself, and the operation of her endocrine system, making her an individual with a disability for the purposes of Section 504 and

the ADA. At the time of filing, I.F. is a second-grade student at a DOE public school and, as such, is qualified to participate in the programs, services, and activities of DOE.

22.     I.F. has been excluded from class time and school-related activities, and unnecessarily missed class time during the current school year solely because of her diabetes. Absent court intervention, I.F. will continue to unnecessarily miss class time and school-related activities unless her parent attends with her because of Defendants' failure to follow Section 504 for routine and necessary diabetes care.

23.     Plaintiff American Diabetes Association's mission is to prevent and cure diabetes and to improve the lives of all those affected by diabetes. Founded in 1940, the Association publishes the global standards of medical care for diabetes as well as scientific and medical research in its peer reviewed journals *Diabetes*, *Diabetes Care*, *Clinical Diabetes*, and *Diabetes Spectrum*. Alongside its published journals, the Association publishes position statements regarding the care and rights of people with diabetes in certain settings, to include *Diabetes Care in the School Setting*. The Association provides consumer resources to people with diabetes and their families including information about living with diabetes and offers programs to individuals with diabetes such as summer camp programs for children with diabetes.

24.     The Association's members and constituents include children with diabetes and their parents who attend DOE public schools and need routine and necessary diabetes-related care. These students have received or are at risk of receiving insufficient related aids, services, and academic accommodations under DOE's current policies, practices, and procedures.

25.     The Association has suffered an injury-in-fact due to DOE's systemic failure to provide routine and necessary diabetes care to students with diabetes in DOE public schools. As a result of DOE's actions, the Association has had to divert resources to expend extensive,

6

focused efforts counseling parents of children attending DOE public schools. The Association has had to divert resources to educate and negotiate with officials from the Defendant agencies regarding provision of appropriate diabetes care that enables children with diabetes to be safe at school. The Association has had to divert considerable resources to conduct a legislative lobbying effort to change New York law regarding the provision of diabetes care in schools, when DOE schools refused to engage in best practices for children with diabetes. And the Association has conducted community outreach and educational efforts aimed at ensuring families and medical providers understand the rights of children with diabetes in school.

26.    Additionally, the Association has members, including Yelena Ferrer, Jocelyne Rojas, and Jaye Fox, who have suffered injury-in-fact due to Defendants' actions and inactions regarding the provision of diabetes-related care to students with diabetes.

27.    Defendant City of New York ("the City") was, and is, a municipal entity created and authorized under the laws of the State of New York. State law vests control of the New York City Department of Education with a chancellor who is appointed by the Mayor of the City of New York. N.Y. Educ. Law § 2590-h. The chancellor is tasked with overseeing every aspect of the schooling of New York City children, from underperforming schools to procurement policy to services for students with disabilities. The chancellor has issued regulations that outline New York City's Section 504 policies and procedures, "Regulation of the Chancellor, Section 504 Policy and Procedures for Students" ("DOE Chancellor's 504 Regulations"). The City is a recipient of federal financial assistance related to the provision of educational services within the meaning of Section 504.

28.    Defendant Bill de Blasio, sued in his official capacity, is the Mayor of the City of New York.

29.    Defendant New York City Department of Education ("NYC DOE") is responsible for operating the public school program in New York City, including providing FAPE and equal access to education to children with disabilities. Defendant NYC DOE is a recipient of federal financial assistance to operate its school system and services within the meaning of Section 504.[1]

30.    Defendant Richard A. Carranza is the Chancellor of the New York City Department of Education ("the Chancellor") and as such is entrusted with powers and duties set forth in N.Y. Educ. Law § 2590-h. The Chancellor is sued in his official capacity.

31.    Defendant New York City Department of Health and Mental Hygiene ("DOHMH") is responsible for public health, including providing medical and health services for school children. Defendant DOHMH is a recipient of federal financial assistance to operate its public health programs and services within the meaning of Section 504.

32.    Defendant Oxiris Barbot is the Acting Commissioner of the New York City Department of Health and Mental Hygiene and is sued in her official capacity.

33.    Defendant Office of School Health ("OSH") is a joint program of the New York City Department of Education and the New York City Department of Health and Mental Hygiene. OSH manages the processes surrounding students who need medication administration, medically prescribed treatment, and other Section 504 services. OSH receives and implements students' Diabetes Medication Administration Forms ("DMAF") and reviews Section 504 medical accommodations requests, including requests for health paraprofessionals.

34.    Defendant Roger Platt is the Chief Executive Officer of the Office of School Health and is sued in his official capacity.

---

[1] The NYC DOE is formally known as the Board of Education of the City School District of the City of New York. *See* N.Y. Educ. Law § 2590-b(1)(a).

## CLASS ALLEGATIONS

35.     Plaintiffs bring this action individually and on behalf of all persons similarly situated pursuant to Fed. R. Civ. P. 23(a) and (b)(2).

36.     The class consists of students with diabetes who are now or will be entitled to receive diabetes-related care and attend DOE schools.

37.     The persons in the class are so numerous that joinder of all such persons is impracticable and the disposition of their claims in a class action is a benefit to the parties and to the Court. DOE estimates the number of students with diabetes attending DOE public schools to be at least 2,000.

38.     There are questions of law and fact common to the class. All individuals are subject to the same citywide illegal policies, practices, and procedures that regularly fail to put diabetes-related care in place for students at the start of the school year, adequately train teachers, paraprofessionals, and nursing staff about delivering diabetes care, force students to unnecessarily miss class time for routine diabetes-related care, and exclude and/or delay students from participating in school-sponsored nonacademic and extracurricular activities, including field trips, school bus transportation, school breakfast, and after-school programs, the legality of which will be determined under Section 504, the ADA, and the NYCHRL.

39.     The claims of the Plaintiffs are typical of the claims of the class. Plaintiffs have been and are being denied their legal right to FAPE and equal access to education due to DOE's failure to assess and provide students with diabetes with routine and necessary diabetes-related care in appropriate settings and ensure their safety at school and school-related events, including in emergencies.

40. Plaintiffs will fairly and adequately protect the interests of the class. There are no conflicts between the Plaintiffs and other class members. Plaintiffs have retained counsel experienced in class litigation relating to education, services for children with diabetes, and the civil rights of persons with disabilities.

41. Defendants have acted and/or failed to act on grounds generally applicable to the class as a whole, thereby making appropriate final declaratory and injunctive relief with respect to the class as a whole.

42. Plaintiffs cannot exhaust their educational due process administrative remedies pursuant to Section 504 because it is futile and impossible to do so. Exhaustion through individual due process claims in Defendants' Impartial Hearing Office is impossible because the harms that the individual plaintiffs allege and the remedies they seek are systemic. Systemic deficiencies are not capable of review in a particular student's due process claim, nor is systemic relief available as a remedy in such a case. Thus, any effort to exhaust for the individual plaintiffs would be futile. Additionally, it is impossible for the Association to exhaust its claims for the organizational harms it has suffered through Defendants' Impartial Hearing Office.

## LEGAL FRAMEWORK REGARDING DOE'S OBLIGATION TO PROVIDE DIABETES-RELATED CARE TO STUDENTS WITH DIABETES

43. Federal and local disability laws – Section 504, the ADA, and the NYCHRL – require Defendants to provide students with disabilities with FAPE in the least restrictive environment ("LRE") and to provide equal access to education.

44. LRE refers to the requirement that a student with a disability must be provided an education, including participating in nonacademic and extracurricular services and activities, with students who do not have disabilities "to the maximum extent appropriate to the needs" of the student with a disability. 34 C.F.R. § 104.34(a)-(b).

45.     Section 504 defines FAPE as "special education and related aids and services . . . that are designed to meet individual educational needs" of students with disabilities as adequately as the needs of students without disabilities, without charge to the student or his or her family. 34 C.F.R. § 104.33.

46.     Students with disabilities are entitled to accommodations at nonacademic and extracurricular activities as well, including "meals, recess periods," "counseling services, physical recreational athletics, transportation, health services, recreational activities, [and] special interest groups or clubs sponsored by recipients" of federal funding. 34 C.F.R. §§ 104.34(b), 104.37(a).

47.     The accommodations and services necessary for students with diabetes to receive FAPE in an appropriate setting are included in Section 504 plans. Such accommodations and services may include routine and necessary medical services such as blood glucose monitoring and insulin injections and staff able to respond appropriately to medical emergencies, including the administration of glucagon.

48.     The ADA also provides for equal access in education. Such access can be achieved through, among other things, reasonable modifications to policies, practices, and procedures; changes in methods of administration; and revisions to eligibility criteria.

49.     Additionally, NYCHRL mandates that educational institutions do not discriminate against students with disabilities.

50.     Thus, the relevant city agencies' legal duties are quite clear: Defendants must be prepared at the beginning of each school year, and continuing throughout the school year, with appropriately trained staff to provide routine and necessary diabetes-related care for students with diabetes in the appropriate setting, including in the students' classroom, as well as during

nonacademic and extracurricular activities, and also be prepared to provide emergency remedies, regardless of whether those activities occur before, during, or after the school day.

## FACTUAL ALLEGATIONS

### *Students with Type 1 Diabetes Have a Disability Which Requires Related Services and Accommodations*

51.    Type 1 diabetes is a chronic and incurable disease of the endocrine system and qualifies as a disability for the purposes of Section 504, the ADA, and NYCHRL.

52.    Type 1 diabetes is characterized by the body's inability to produce insulin. Insulin is the hormone that regulates the amount of glucose in the blood; it takes the glucose from the blood into the cells where it can be used as energy. Glucose is the body's main energy source. Thus, failure to produce insulin deprives the body of glucose and, as a result, energy. Insulin is necessary to sustain life, and thus people with type 1 diabetes must receive supplemental insulin to help regulate their glucose and energy levels. Insulin can be delivered through either an injection with a syringe or pen or a pump implanted into the skin.

53.    Typically, insulin must be administered each time a person with diabetes consumes any food containing carbohydrates, including meals and snacks. To avoid short- and long-term complications, glucose levels are monitored, adjusting insulin and carbohydrate intake as needed. If the glucose levels get too low, a condition called hypoglycemia results. If left untreated, hypoglycemia can lead to seizures, unconsciousness, and even death.

54.    Severe hypoglycemia should be treated with quick-acting carbohydrates, such as juice, and potentially an injection of glucagon, a life-saving hormone that causes the liver to release glucose reserves into the student's bloodstream. Glucagon cannot be self-administered, because it is only given when a person is unresponsive.

55.    On the opposite end of the blood glucose spectrum, hyperglycemia is the condition of having too much glucose in the blood. This can occur for a variety of reasons, including if a person is ill, consumes more carbohydrates than planned, or misses a dose of insulin. When hyperglycemia occurs, a "correction" dose of insulin may be needed to lower the levels of glucose in the blood. If hyperglycemia is untreated, it can lead to symptoms including thirst, frequent urination, nausea, blurry vision, headache, and fatigue. Chronic hyperglycemia leads to long term complications of diabetes, including damage to the heart, kidneys, eyes, and nerves.

56.    While the specifics of care for each student with type 1 diabetes vary based on factors including but not limited to age and complexity of regimen, and can change over time, these treatments for managing type 1 diabetes are routine, well-established, and necessary.

### *The Legal Framework for Providing Diabetes-Related Care for Students with Diabetes in DOE Public Schools*

57.    The NYC DOE operates a school system serving around one million children dispersed throughout thirty-two geographic school districts across the five boroughs. For the 2018 financial year, the NYC DOE had an operating budget of $25.2 billion.

58.    At least 2,000 students attending NYC DOE public schools have type 1 diabetes.

59.    Students with diabetes are considered students with disabilities for the purposes of Section 504, and thus those who are entering DOE public schools for the first time should receive an evaluation, have a Section 504 meeting, and have a Section 504 plan in place for the first day of school.

60.    According to DOE Chancellor's 504 Regulations (III)(B), new Section 504 requests initiated by parents must be submitted in writing. For students who already have Section 504 plans, the plans must be updated "on an annual basis before the end of the school year."

DOE Chancellor's 504 Regulations (V)(E)(1). A signed copy of the finalized Section 504 accommodation plan must be provided to parents, DOE Chancellor's 504 Regulations (V)(C), so that parents know which accommodations are in place for their student to be safe at school.

61.     Schools annually provide paperwork to parents and physicians to determine if a student's diabetes-related needs have changed, and as described above, if so, a meeting must be convened and the Section 504 plan must be modified.

62.     The timing of the provision of services and accommodations for students with diabetes is inflexible because starting from the beginning of the first day of school, the accommodations and services are medically necessary. Moreover, there must be a reasonable deadline for the plan to be in place *prior* to the start of the school year so the necessary training of both medical (nurse) and non-medical (paraprofessional and teacher) providers can take place.

63.     Licensed nurses, nurse practitioners, physician assistants, and physicians are authorized to "calculate prescribed insulin dosages, administer prescribed insulin, program the prescribed insulin pump, refill the reservoir in the insulin pump, change the infusion site, [and] inject prescribed glucagon." N.Y. Educ. Law § 902-a (McKinney 2015). Unlicensed school personnel, such as paraprofessionals and teachers, may be trained to inject prescribed glucagon, N.Y. Educ. Law § 921 (McKinney 2015), and to monitor blood glucose. N.Y. STATE EDUC. DEP'T, GUIDELINES FOR MEDICATION MANAGEMENT IN SCHOOLS 2015 29 (Rev. Dec. 2017), http://www.p12.nysed.gov/sss/documents/MedicationManagement-DEC2017.pdf.

64.     New York State Law and guidance recognizes that there is rarely a medical reason for students with diabetes to receive care outside of the classroom, and it can be safer and less disruptive to a student's education for care to be administered in the classroom. According to state guidance, "[t]he risk of exposure to blood borne pathogens by [] blood glucose monitoring

is minimal and should not be used as a reason to prohibit a student from checking blood glucose outside of the health office," and "[t]he more quickly high or low blood glucose is treated, the more likely the student will not lose instructional time, and long term health complications will be prevented," N.Y. STATE EDUC. DEP'T, GUIDELINES FOR MEDICATION MANAGEMENT IN SCHOOLS 2015 28-29 (Rev. Dec. 2017), http://www.p12.nysed.gov/sss/documents/MedicationManagement-DEC2017.pdf. This guidance, coupled with Section 504's LRE provision, make clear that DOE must conduct an individual assessment of each child to determine whether diabetes-related care and accommodations should be administered in the student's classroom, including insulin and blood glucose testing, taking into account individual needs and preferences.

### DOE'S Failure to Provide Routine and Necessary Diabetes Care to Students with Diabetes in Appropriate Settings

65.     DOE systemically fails to provide students with diabetes with routine and necessary diabetes-related care in appropriate settings.

66.     In DOE public schools, students with diabetes regularly start the school year without services and finalized Section 504 plans in place, forcing children with diabetes either to attend school without those services and a plan in place, have their parents attend with them, or miss the critical first days of school and to be excluded from school-related activities, including field trips and after and before-school programs.

67.     In order for a student with diabetes to get a Section 504 plan, their parents must have their medical provider complete the DOE's Diabetes Medication Administration Form. DOE will not accept a completed DMAF until at least June 1, and it is not due until July 15, approximately three weeks after the end of the school year.

68.    Defendants do not typically conduct Section 504 planning over the summer, leaving students with diabetes without services and Section 504 plans in place for the first day of school.

69.    Starting school without a plan for a child's care in place wreaks havoc on the lives of families of students with diabetes. Parents and guardians are forced to choose to send their children to school with uncertainty about whether their children will be safe, keep their kids out of school entirely, or if possible, accompany their child to school to provide the care their child requires.

70.    The harm of being forced, by virtue of disability, to either have a parent accompany the child all day to administer necessary care or else miss the first day of school harms students irreparably. The first several days of school are the student's first opportunities to meet their classmates and teachers, adjust to separation from parents and gain a measure of independence, learn school rules, and develop a routine. Students with diabetes are routinely deprived of this opportunity solely because of their disabilities, and the feeling of being ostracized and being marked as "different" from their peers can have both immediate and lasting detrimental psychological consequences.

71.    Parents are frequently forced to miss work either to care for their children at home or to go to the school to provide necessary diabetes-related care.

72.    Eventually, if and when DOE gets around to finalizing and implementing Section 504 plans, they continue to unnecessarily segregate, ostracize, and discriminate against students with diabetes by refusing to provide routine and necessary diabetes-related care in students' classrooms.

73.    DOE fails to conduct the individualized determination for the location of care, including the administration of insulin, blood glucose monitoring, and treatment of low blood

16

glucose, as required by the law. Instead, DOE regularly requires students to miss critical classroom instruction by forcing them to leave the classroom to receive diabetes care multiple times per day, without considering whether this care could be provided in the classroom, or what is best for the individual student. If possible and preferable to the parent and student, diabetes care should be administered in the classroom, regardless of who administers it, with exceptions based on the individual needs of the child. *See* N.Y. Educ. Law § 916-b (McKinney 2015).

74.    DOE also denies students with diabetes and their parents the security of reliable, consistent policies related to the potentially life-saving administration of glucagon and frequently fails to train unlicensed personnel to administer glucagon, despite clear state law to the contrary. *See* N.Y. Educ. Law § 921 (McKinney 2015). Their failure to train unlicensed personnel to administer glucagon puts children with diabetes in danger if they experience hypoglycemia in the event the school nurse is unavailable, especially during school-sponsored activities.

75.    DOE's refusal to provide appropriate care for students with diabetes extends beyond the school day and outside the school building. DOE regularly refuses to provide accommodations during school-sponsored nonacademic and extracurricular activities, including before and after school care, bus transportation, meals, and field trips. For example, rather than provide trained personnel to administer diabetes-related care for field trips, DOE frequently forces parents to attend field trips to provide care as a condition of their child's attendance. Additionally, an addendum to the 2018-2019 DMAF explicitly refuses to ensure diabetes-related care during school breakfast: "The school nurse may not always be on site when breakfast is served. It is the parent's responsibility to ensure a back-up plan is in place to provide insulin coverage if/when the school nurse is not on site to give insulin prior to breakfast." The form cites options such as the parent giving insulin or "grandmother will come give insulin after breakfast."

The form does not provide details about when or how the parents would be informed that the nurse is not present on any particular day.

76.     These issues – delay in getting services in place, failure to adequately train staff in the delivery of diabetes care, forcing students to miss class time to receive routine diabetes-related care without an individualized assessment of whether missing class time is necessary, and delaying and in some instances refusing to provide accommodations for school-related activities before, during, and after-school – are blatant violations of city and federal law and result in substantially unequal educational opportunities for students with diabetes.

### *Plaintiffs' Individual Allegations*

### M.F.

77.     M.F. is a four-year-old child with type 1 diabetes. Currently, M.F. attends pre-school at a DOE public school in Manhattan.

78.     M.F.'s mother, Yelena Ferrer, is a member of the American Diabetes Association.

79.     M.F. was diagnosed with type 1 diabetes in June 2018. M.F. cannot independently self-administer his own diabetes care, which means that he cannot test his glucose levels independently, determine the dose of insulin he needs without a trained adult, and often fails to recognize hypoglycemia and hyperglycemia.

80.     M.F. was scheduled to start preschool in September 2018. Ms. Ferrer submitted a timely request for accommodations for M.F. to DOE in June 2018. No Section 504 meeting ever took place, and Ms. Ferrer was not contacted about her son at any point before the start of school.

81.     When M.F. arrived for the first day of school on September 5, 2018, the school nurse was on maternity leave and a daily contract nurse, unfamiliar with diabetes care or M.F.'s

needs, was present instead. Therefore, Ms. Ferrer remained with M.F. for the majority of the

school day and provided all of his care herself.

82.    M.F. was assigned a paraprofessional who had no training in diabetes care. Ms.

Ferrer personally trained the paraprofessional in how to recognize the symptoms of hypo- and

hyperglycemia, and to read M.F.'s Continuous Glucose Monitor ("CGM"). The paraprofessional

monitors M.F.'s CGM and remains in constant communication with Ms. Ferrer for guidance on

how to interpret the blood glucose values but is not trained to manually test his blood glucose

level, which is critical because the CGM can be inaccurate. Ms. Ferrer explicitly requested that

the paraprofessional be trained in and responsible for manual blood glucose checks in M.F.'s

Section 504 plan request in June 2018.

83.    From September 10, 2018 to October 22, 2018, M.F.'s school had a new

temporary nurse each day, none of whom were trained in the provision of diabetes-related care.

Ms. Ferrer went to the nurse's office each morning to meet the new nurse, who were all

unfamiliar with both M.F.'s CGM and his insulin pump. Though M.F.'s request for a Section

504 plan specifies that a nurse must check blood glucose levels and administer insulin at

breakfast, lunch, snack, and as needed, school staff could not provide any of this care.

84.    During that time, Ms. Ferrer visited M.F.'s school 3-5 times a day to test his

blood glucose levels and administer insulin. Ms. Ferrer needed to be available to care for her son

both routinely and in case of an emergency.

85.    Though Ms. Ferrer submitted all necessary documents in June 2018, the school

did not offer her a Section 504 plan until October 16, nearly six weeks after school started.

86.    On October 18, 2018, Ms. Ferrer emailed school officials about the lack of

implementation of the services outlined in M.F.'s draft Section 504 plan, and her concerns about

M.F.'s situation, impressing on them the severity of the risk to which they had exposed her son. She informed them of her daily visits to the nurse's office where she was always troubled by their inexperience with diabetes-related care. On several occasions, the nurses asked her to train them on the use of M.F.'s insulin pump and CGM. She expressed that this situation was "beyond unnerving and stressful" and that M.F. is "always a moment away from a severe health episode." She made clear that they were in violation of the law by not providing appropriate care.

87.    In response to Ms. Ferrer's complaints, on October 24 and October 25, 2018, numerous school officials met with M.F.'s parents. They stated that they had resources issues and that is why M.F. was not receiving the care he needed. They told Ms. Ferrer the temporary nurse who was familiar with diabetes care and had started on October 23 was going to stay at the school, and that they would begin making requests for nurses on field trips, but that they "could not guarantee" a nurse would be available for field trips. In those situations, either one of M.F.'s parents would have to go on the field trip, or the trip for the whole class would be cancelled.

88.    Ms. Ferrer raised the issue of why her son was being removed from class to have his blood glucose checked and insulin administered, because he was missing valuable class time. The school officials told Ms. Ferrer that the nurse's office was close in proximity to the classroom and that it was not appropriate for the nurse to leave the nurse's office.

89.    Lastly, the school officials indicated that the week of October 29, 2018—two months after the start of school—they were going to have the nurse and paraprofessional trained on the basics of diabetes so that they all are able to recognize the signs and symptoms of hypoglycemia and hyperglycemia.

90.    As a result of the delay in addressing M.F.'s situation, the school did not notify Ms. Ferrer it needed updated doctor's orders until October 25, 2018. Thus, at the time of filing,

despite the recent efforts by school personnel to provide care, Ms. Ferrer continues to provide M.F. all diabetes-related care at school.

91.    M.F. has missed school several times this year because Ms. Ferrer was not able to go to school to provide care, including two times after the meeting with school officials. Ms. Ferrer also had to pick M.F. up from school early because of ineffective management of his blood glucose levels several times during the month of October.

92.    M.F. has faced numerous other issues related to diabetes care. On October 10, 2018, M.F. would have been excluded from a field trip where no nurse was provided if Ms. Ferrer had not attended with him and provided the necessary care. Additionally, the school offers no care at breakfast, forcing Ms. Ferrer to remain with M.F. to check his blood glucose level, calculate the carbohydrate load of his breakfast meal, and administer insulin. M.F., who has become used to Ms. Ferrer being at school with him, has had trouble adjusting to attending school without her.

93.    Ms. Ferrer feels distressed over the harm that this continued discrimination will cause M.F. because of the lack of diabetes care, and distressed over the fact that even if M.F.'s situation is temporarily resolved, it can change at any point in time during the year and she will face the same situation next year unless DOE alters their systemic policies, practices, and procedures regarding the provision of diabetes-related care.

**M.R.**

94.    M.R. is a five-year-old child with type 1 diabetes. Currently, M.R. is a kindergartner at a DOE public school in Brooklyn.

95.    M.R.'s mother, Jocelyne Rojas, is a member of the American Diabetes Association.

21

96.     M.R. was diagnosed with type 1 diabetes in June 2017. M.R. cannot independently self-administer her own diabetes care, which means that she cannot test her glucose levels independently, determine the dose of insulin she needs without a trained adult, and often fails to recognize hypoglycemia and hyperglycemia.

97.     Ms. Rojas attempted to submit a timely request for accommodations for M.R. to DOE in late June or early July 2018. A school official told Ms. Rojas that they could not accept the forms because the school was closed for the summer, and that she should come back the last week in August when the school re-opens. When the school re-opened in August, Ms. Rojas submitted her medical documents in person. DOE never gave Ms. Rojas a date for a Section 504 meeting, let alone approved and finalized a Section 504 plan.

98.     On September 5, 2018, the first day of school, Ms. Rojas discovered that the school nurse would be out for 2-3 weeks. Since the school could not provide any diabetes-related care, Ms. Rojas spent the entire first day with her daughter at school, administering all necessary care.

99.     During the nurse's absence either Ms. Rojas or her mother (M.R.'s grandmother) were with M.R. all day at school providing all necessary diabetes-related care. Ms. Rojas could not go into work, and sometimes worked remotely from an empty classroom in the school. Ms. Rojas worried about losing her job in order to provide M.R.'s care, but knew that if she did not provide that care M.R. could not attend school.

100.     On September 11, 2018, Ms. Rojas requested a meeting with the principal, vice principal, teacher, and paraprofessional. No one had been trained on diabetes so Ms. Rojas gave them an overview of diabetes and the care she expected them to provide M.R.

101.    Approximately three weeks into the school year, the nurse returned to school. Though he had treated children with diabetes in the past, he had no training with an insulin pump or CGM. Every day for the next week, Ms. Rojas went to school prior to M.R.'s lunchtime insulin administration and showed the nurse how to use M.R.'s CGM and insulin pump. The next week, Ms. Rojas' mother came to school for every insulin administration and supervised the nurse using M.R.'s CGM and insulin pump.

102.    In total, Ms. Rojas and her mother provided all diabetes-related care to M.R. for the first 3-4 weeks of school, trained all of the staff themselves, and supervised the nurse's care for an additional week.

103.    M.R. was assigned a paraprofessional the first day of school. However, this paraprofessional had not been trained on diabetes care. The paraprofessional would not contact Ms. Rojas, would not communicate with her, and could not hear when the CGM was beeping to indicate a high or low blood sugar. On one occasion, M.R.'s blood glucose was over 300 and the CGM was beeping. The teacher asked if M.R. needed any care and the paraprofessional said that M.R. was fine. Ms. Rojas did not feel M.R. was safe with this paraprofessional and requested a new one.

104.    The second paraprofessional missed three days of school the first week, and no backup paraprofessional was provided. Instead, three office staff members, none of whom were familiar with M.R.'s situation or had any medical training, substituted. Ms. Rojas again requested a new paraprofessional.

105.    The third paraprofessional has cared for a child with diabetes in the past, so she has some understanding of M.R.'s needs. However, she was told by school officials the paraprofessional could not administer glucose tablets or carbohydrates in the event of a low

23

blood glucose reading and instead M.R. had to be taken to the nurse's office, located on another floor.

106.    When M.R.'s blood glucose level is very low, Ms. Rojas strongly prefers that they confirm the CGM reading with a finger prick test, which is more accurate, but neither the nurse nor the paraprofessional administer finger pricks to check M.R.'s blood glucose levels, instead relying on the CGM.

107.    Other issues with M.R.'s care abound. She is removed from class for routine insulin administration every day for approximately 15-20 minutes before lunch. M.R. is also not permitted to eat any snack with carbohydrates in the afternoon, because snack time takes place when the nurse is on lunch and therefore unavailable to administer insulin. Additionally, the school does not provide a nurse during breakfast, which M.R. attends twice a week and would attend more frequently if Ms. Rojas did not have to provide care herself. Ms. Rojas also expects to provide care in the event of a field trip because a school official called Ms. Rojas' mother about field trips and asked, "What's going to happen with M.R.?"

108.    Ms. Rojas has missed significant periods of work to provide M.R.'s diabetes-related care and worries that a life-threatening hypoglycemic or hyperglycemic incident may go untreated due to lack of training and/or unavailability of the nurse or paraprofessional.

109.    Ms. Rojas feels distressed over the harm that this continued discrimination will cause M.R. and overwhelmed due to the fact that she will face this continuing situation throughout this school year and the next unless DOE alters their systemic policies, practices, and procedures regarding the provision of diabetes-related care.

**I.F.**

110.    I.F. is a seven-year-old child with type 1 diabetes. Currently, I.F. is a second-grader at a DOE public school in Manhattan.

111.    I.F.'s mother, Jaye Fox, is a member of the American Diabetes Association.

112.    I.F. was diagnosed with type 1 diabetes in October 2013. I.F. needs assistance to manage her diabetes care, which means that she cannot test her glucose levels independently, determine the dose of insulin she needs without a trained adult, and often fails to recognize hypoglycemia and hyperglycemia.

113.    I.F. first enrolled in a DOE school in kindergarten for the 2016-2017 school year. Ms. Fox submitted a timely request for accommodations for I.F. to DOE in June 2016. DOE did not give Ms. Fox a date for a Section 504 meeting, let alone approved and finalized a Section 504 plan before the start of the school year.

114.    I.F. experienced numerous discriminatory barriers in kindergarten. The school would only provide I.F. diabetes-related care, including blood glucose checks and insulin administration, in the nurse's office, which was on the other side of the building and on another floor from I.F.'s regular classroom. I.F. regularly missed half or all of recess to receive routine diabetes care because, Ms. Fox was told, the school had only one nurse who could not leave the nurse's office. After advocacy from Ms. Fox, I.F. was permitted to have her blood glucose checked in the classroom but only if she moved to the back away from the other students. The school inconsistently provided a nurse on school field trips, and if no nurse was available, a parent was required to go with her or she could not attend. I.F. was also unable to attend any after-school activities for the first several months of kindergarten because no nurse was provided.

25

115.    When choosing a first grade school, I.F.'s parents factored in the distance from class to the nurse's office because they knew that school officials were likely to force I.F. to travel back and forth from class instead of providing care in the classroom. I.F.'s parents did not send I.F. to an otherwise excellent school in Queens because the nurse's office was four floors away, and they did not want I.F. to miss so much class time and recess traveling back and forth for routine diabetes care.

116.    In the 2017-2018 school year, I.F. enrolled in first grade at a public school in Manhattan, and again, Ms. Fox submitted all paperwork as soon as the forms were available in June 2017. In addition to a Section 504 plan, Ms. Fox submitted a request for bus transportation. Ms. Fox did not receive a finalized Section 504 plan until April 2018, almost eight months after the start of school, and only after retaining a private attorney to support her in the process.

117.    Though Ms. Fox received a notice that bus transportation would be provided, she learned that the bus school officials had requested was a general bus, not a medical bus. I.F. had no bus transportation to or from school for the first month of school in first grade and I.F.'s father took her every day.

118.    I.F. spent the first two months of school getting all diabetes-related care in the nurse's office, even though of two of I.F.'s teachers told Ms. Fox she was missing a significant amount of class time each day for diabetes care. The classroom teacher informed Ms. Fox at a parent-teacher conference I.F. could not test her blood glucose in the classroom because there was a risk of "bloodborne pathogens," invoking a stereotype rather than an actual risk about diabetes.

119.    The first paraprofessional I.F. was assigned in first grade had little if any training in diabetes management and care. She inserted glucose test strips into the machine backwards,

26

needed assistance from I.F. using the lancet, and, on one occasion where I.F. had a very low blood glucose level, walked a drowsy I.F. to the nurse's office on another floor instead of treating the low immediately.

120.    Non-academic school activities presented similar issues. I.F.'s school provided no after-school nursing care for the entire first semester of school, and therefore I.F. was unable to participate in any after-school activities. The class went on many field trips that year, and the school sometimes failed to provide a nurse, forcing I.F.'s father to miss work to attend field trips with her to provide her care.

121.    Though Ms. Fox timely submitted I.F.'s draft Section 504 plan for second grade (which was essentially the same as the previous year's) in June 2018, and I.F. is enrolled in the same school, the school has not responded with a finalized Section 504 plan.

122.    This year, I.F. has faced many of the same discriminatory barriers. School officials have finally agreed I.F. should be receiving insulin administration in her classroom, yet they have promised only "best efforts" to provide classroom care and when there are not enough nurses on duty, I.F. must leave class to go to the nurse's office for routine care. Once again Ms. Fox requested bus transportation, but there was no bus available the first day of school. A paraprofessional was then assigned, but is frequently absent. Ms. Fox only learns the morning of or late the night before that the paraprofessional is unavailable and that I.F.'s father must take her to school. Nurse coverage on field trips remains spotty, and already this year I.F.'s father had to attend a field trip to provide care.

123.    For the third year in a row, Ms. Fox is distressed and concerned that I.F. has not received a finalized Section 504 plan outlining I.F.'s needs. Similarly, I.F.'s father must remain

on call to take I.F. to school when no paraprofessional is available and provide care to I.F. while she is on field trips.

124.    Ms. Fox feels distressed over the harm that this continued discrimination will cause I.F. and over the fact that she will face the same situation throughout this school year and in the next, unless DOE alters their systemic policies, practices, and procedures regarding the provision of diabetes-related care.

### The American Diabetes Association

125.    The American Diabetes Association's mission is to prevent and cure diabetes and to improve the lives of all those affected by diabetes.

126.    In furtherance of its mission, the Association advocates for students with diabetes in the school setting. The Association accomplishes this by offering a wide variety of programs and resources to families. Some of these activities include: the Legal Advocate Program, which provides one-on-one legal assistance for families facing discrimination in school, at work, in places of public accommodation, and in jail, prison, and law enforcement interactions; the Safe at School campaign, which offers education and self-advocacy tools, guidance on best practices for delivering diabetes care in the school setting, and delivery of know-your-rights presentations; and the State Advocacy Program, which sponsors, supports, or opposes legislation and regulatory activities impacting students with diabetes.

127.    The Association has suffered an injury-in-fact because DOE's systemic failure to provide routine and necessary diabetes-related care to students with diabetes forces the Association's Legal Advocate Program to divert resources to conduct intakes, tracking, and follow-up assistance. These intakes have been extensive and come from parents or their

attorneys, regarding students with diabetes who attend DOE public schools and need diabetes-related care.

128.    As a result of DOE's systemic failure to provide students with routine and necessary diabetes-related care in appropriate settings, the Association has fewer resources to dedicate to creating new legal resources for constituents and to helping individuals facing other forms of discrimination.

129.    The Association has further suffered injury-in-fact because DOE's systemic failure to provide routine and necessary diabetes-related care to students with diabetes caused the Association's Safe at School program to divert its resources to: gather and coordinate information; meet with New York City pediatric endocrinology practices; document problems; deliver Know Your Rights presentations for New York City families; contribute to the creation of New York state-level guidance and resources; strategize; and educate and negotiate directly with DOE on behalf of New York City children with diabetes.

130.    For example, in or about 2010, Association staff and volunteers met with Defendant Dr. Platt, the Chief Executive Officer of the Office of School Health, to convince DOE to permit unlicensed, trained school staff to administer the lifesaving medication glucagon. The Safe at School program is small, but its focus is nationwide. Occasionally, a particular school district's approach to diabetes care is so problematic for students with diabetes that it demands the campaign's attention. When one school district requires this individualized attention, as the DOE has, it diverts the program's resources away from engaging in projects and creating resources that have nationwide utility and impairs the program's ability to assist all students with diabetes. Safe at School's burdened resources include both staff and volunteer time. Volunteers are a critical Association resource; the Association relies heavily upon and

indeed could not carry out its mission without assistance from its healthcare professional and attorney volunteers. Both staff and volunteers have devoted significant time to addressing the inadequate provision of diabetes care in DOE schools.

131.    The Association has further suffered an injury-in-fact because DOE's systemic failure to provide routine and necessary diabetes-related care to students with diabetes forced the Association to divert resources to focus on lobbying efforts in New York state. Association staff spoke with New York City families and healthcare professionals, many of whom are Association volunteers, about their/their patients' experiences receiving diabetes care in schools. Having identified a systemic problem with the provision of diabetes care in New York state and New York City, the Association was forced to divert further, substantial time and economic resources to passing legislation in New York aimed at expanding the state statutory rights of children with diabetes in the school setting. The legislation, pursuant to the Association's efforts, was signed into law on October 30, 2014. 2014 N.Y. Laws 423; N.Y. Educ. Law §916-b, 921 (McKinney 2015). This legislative advocacy required the diversion of extraordinary staff and volunteer time spent meeting with legislators, testifying, and gathering information from students and families. It also required the hiring of a contract lobbyist to assist with advocacy to pass the legislation. As a result of DOE's systemic failure to provide students with routine and necessary diabetes-related care in appropriate settings, the Association had fewer resources to dedicate to other important legislative efforts in other key states.

132.    Despite the Association's outreach to negotiate and collaborate with Dr. Platt and DOE and its efforts to spearhead legislation signed into law in 2014, and despite Dr. Platt's continued employment with OSH throughout the many years of the Association's advocacy in

New York City, Defendants continue to exclude students with diabetes from its programs and fail to provide FAPE.

133.    Despite extensive historical advocacy efforts expended by the Association, throughout 2018, the Association continued to hear from and about families experiencing discrimination by DOE. As a result, the Association was forced to conduct additional outreach and educational efforts to reach families with children with diabetes and pediatric endocrinology practices, to ensure that members of the New York City diabetes community understand a child's legal rights to receive appropriate diabetes care in DOE schools.

134.    Three separate Association programs have been forced to divert significant resources to identify and counteract DOE's deficient provision of related aids and services. This diversion is an injury that is both ongoing and directly traceable to DOE's actions in failing to provide routine and necessary diabetes-related care for students with diabetes. This injury would be redressed by injunctive and declaratory relief. In addition, each act of discrimination DOE's policies cause directly frustrates the Association's mission of improving life for all people affected by diabetes because provision of routine and necessary diabetes-related care in schools is crucial to ensuring students with diabetes can be safe at school.

135.    The Association also has members, including Yelena Ferrer, Jocelyne Rojas, and Jaye Fox, who have suffered injury due to DOE's actions and inactions. The Association's constituent and membership base includes students with diabetes in New York City. These constituents are children with diabetes who attend DOE public schools and who are being denied the routine and necessary diabetes care they need in order to receive an appropriate education. The Association's members and constituents also include parents of students with disabilities who can pursue their children's claims for denial of services and meaningful access to education

31

on behalf of their children. The Association has heard from many of these constituents who have children with diabetes who have been denied routine and necessary diabetes care by DOE. Therefore, one or more of the Association's members have been injured as a direct result of DOE's discriminatory actions and failures to act and would have standing to sue to challenge DOE's systemic legal violations in their own right. As a membership organization, the Association has standing on behalf of these members.

136.    The interests that the Association seeks to protect in this litigation are germane to its mission and purpose. The Association's current strategic plan calls for the organization to "support people" as one of its three focus areas and within Government Affairs and Advocacy, one of the Legal Advocacy priorities is to "Enable young people with diabetes to be safe and have the same opportunities as their peers at school and school-related activities." The Association is challenging DOE's systemic failure to provide legally-mandated routine and necessary diabetes care to students with diabetes. These interests are germane to the Association's purpose of supporting people with diabetes.

137.    Plaintiffs' claims are limited to injunctive and declaratory relief for reforms to DOE's policies, practices, and procedures and exclusively seek systemic reforms that do not require the participation of individual Association members in the lawsuit.

138.    Having to divert resources to address the inadequate diabetes-related care for students with diabetes is an injury that is redressable by DOE. If DOE corrected its policies, practices, and procedures and ensured that students received the diabetes-related services and accommodations they need, the Association would be able to re-direct its resources toward its other priority areas.

## CAUSES OF ACTION

### Count I

**Violation of Section 504 of the Rehabilitation Act of 1973
(29 U.S.C. § 794)**

139.     Plaintiffs incorporate by reference each and every allegation contained in the foregoing paragraphs as if specifically alleged herein.

140.     Section 504 provides, in pertinent part:

> No otherwise qualified individual with a disability in the United States … shall, solely by reason of his or her disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance[.] 29 U.S.C. § 794(a).

141.     Defendants were, at all times relevant to this action, and are currently recipients of federal financial assistance within the meaning of Section 504, and Defendants provided and provide a "program or activity" where "program or activity" is described as "all the operations of" the recipient, which includes the educational programs and activities in schools in New York City. 29 U.S.C. § 794(b).

142.     Plaintiffs and members of the putative class were, at all times relevant to this action, and are currently "otherwise qualified individuals with disabilities" within the meaning of Section 504. All members of the putative class have diabetes, an impairment that substantially limits a major bodily function by affecting the functioning of their endocrine system and substantially affects the major life activities of eating and caring for oneself. All attend DOE public schools and are qualified – with or without reasonable modification – to participate in DOE's educational services. The Association has members who have diabetes and who, like members of the class, are individuals with disabilities and attend DOE public schools.

143.    DOE has violated the rights of Plaintiffs and members of the putative class secured by Section 504 and its implementing regulations. *See* 28 C.F.R. § 41.1.

144.    The Chancellor of the DOE has issued regulations that set forth Section 504 policies and procedures of the DOE for students attending DOE schools and programs, which DOE has violated.

145.    As defined by Section 504, FAPE includes "special education and related aids and services . . . that are designed to meet individual educational needs" of students with disabilities as adequately as the needs of students without disabilities are met, without charge to the student or family. 34 C.F.R. § 104.33.

146.    Through their policies, practices, and procedures relating to the provision of diabetes-related care in DOE public schools, Defendants fail to meet their obligations under Section 504's regulations to provide FAPE including, but not limited to:

i)    By employing policies, practices, and procedures that regularly leave students with diabetes without diabetes-related care at the start of each school year and beyond; failing to individually assess whether routine and necessary diabetes-related care, including the administration of insulin and blood glucose checks, should be provided in students' classrooms and thereby unnecessarily forcing students to miss class time; failing to adequately train personnel, including teachers, paraprofessionals, and nurses, to deliver routine diabetes-related care, including administering insulin, glucagon, and performing blood glucose monitoring; and failing to provide accommodations during extracurricular and nonacademic activities and burdening parents to attend these events as a condition of their child's participation, Defendants do not comply with their obligation to provide FAPE to each qualified handicapped

person who attends schools operated by DOE in New York City, 34 C.F.R. §
104.33(a), nor their obligation to provide special education and related aids and
services that are designed to meet the individual educational needs of handicapped
persons as adequately as the needs of non-handicapped persons, 34 C.F.R. §
104.33(b);

ii)  By forcing parents of students with diabetes, but not parents of non-handicapped
students, to deliver care at school and attend school activities such as nonacademic
and extracurricular activities, as a condition of their child's attendance, Defendants do
not provide students with diabetes a free education, 34 C.F.R. § 104.33(c).

147.    Through their policies, practices, and procedures relating to the provision of
diabetes-related care in New York City, Defendants fail to meet their obligations under Section
504's regulations to educate students in the least restrictive environment including, but not
limited to:

i)  By failing to individually assess whether routine and necessary diabetes-related care,
including the administration of insulin, glucagon, blood glucose checks, and treating
hyperglycemia and hypoglycemia should be provided in students' classrooms and
thereby unnecessarily forcing students to miss class time for routine and necessary
diabetes-related care and failing to provide routine and necessary diabetes-related
care during nonacademic and extracurricular services and activities, Defendants fail
to educate students in the most integrated setting appropriate to their needs, 34 C.F.R.
§ 104.4(b)(2). Nor do they comply with their obligation to educate handicapped
persons with non-handicapped persons to the maximum extent appropriate to meet
the needs of the handicapped person, 34 C.F.R. § 104.34(b).

35

ii)  By failing to provide routine and necessary diabetes-related care during nonacademic and extracurricular services and activities, Defendants fail to afford handicapped students an equal opportunity for participation in such services and activities, 34 C.F.R. § 104.37(a)(2).

148.    Through their policies, practices, and procedures relating to the provision of diabetes-related care in DOE public schools, Defendants fail to meet their obligations under Section 504's regulations as incorporated into the DOE Chancellor's 504 Regulations. By failing to hold Section 504 meetings within thirty days of receiving the required documentation and failing to finalize Section 504 plans for students with diabetes prior to the beginning of the school year, Defendants fail to allow students with disabilities to participate on an equal basis with students who are not disabled and fail to meet requirements for an annual review. *See* DOE Chancellor's 504 Regulations, (V), (V)(D), (V)(E)(1).

149.    By failing to ensure that students with diabetes in New York City receive routine and necessary diabetes-related care, the services that the Defendants offer are not equal to or not as effective in affording equal opportunity as those offered to non-disabled students.  This conduct violates, among other provisions, 34 C.F.R. § 104.4(b)(1)(ii).

150.    Defendants fail to provide Plaintiffs and members of the putative class with educational services that are as effective as those services available to their non-disabled peers, and thus deny students with diabetes equal opportunity: (1) to obtain the same result, (2) to gain the same benefit, and (3) to reach the same level of achievement as their non-disabled peers. Employing policies, practices, and procedures that regularly leave students with diabetes without diabetes-related care at the start of each school year, failing to individually assess whether routine and necessary diabetes-related care should be provided in students' classrooms and

thereby unnecessarily forcing students to miss class time for routine and necessary diabetes-related care, failing to train personnel, including teachers, paraprofessionals, and nurses, and delaying students' participation in or excluding students altogether from nonacademic and extracurricular activities by delaying the provision of or refusing to provide routine and necessary diabetes-related care during such activities does not constitute equal access to Defendants' education programs and services. As such, the educational services offered to students with diabetes in DOE public schools are not sufficient to provide equal access to Defendants' education programs and services for Plaintiffs and members of the putative class. This conduct violates, among other provisions, 34 C.F.R. § 104.4(b)(1)(iii).

151.    Defendants fail to make reasonable modifications to their policies, practices, and procedures even though these modifications are necessary to avoid discriminating against Plaintiffs and members of the putative class, in violation of Section 504.

152.    Specifically, Defendants fail to make reasonable modifications to their educational services to ensure that students with diabetes have equal access to education. Such reasonable modifications may include, but not be limited to, allowing students with diabetes to receive diabetes-related care within the classroom as well as providing school personnel trained in the provision of diabetes-related care in the classroom and during nonacademic and extracurricular activities.

153.    Defendants use methods of administration that have the effect of subjecting Plaintiffs and members of the putative class to discrimination by reason of their disability because Defendants' policies and practices effectively deny students with disabilities in DOE schools full access to their curriculum, nonacademic, and extracurricular activities as is necessary for them to achieve educational progress. As such, these methods of administration

37

also have the purpose and effect of defeating or substantially impairing accomplishments of the objectives of Defendants' educational services with respect to Plaintiffs and members of the putative class because these students with disabilities are denied equal access to education. This conduct violates, among other provisions, 34 C.F.R. §§ 104.4(b)(4)(i) and (ii).

154.    Because Defendants' discriminatory conduct is ongoing, declaratory relief and injunctive relief are appropriate remedies. Further, as a direct result of Defendants' actions, Plaintiffs and members of the putative class are suffering irreparable harm, including lost educational opportunities. Therefore, speedy and immediate relief is appropriate.

155.    Pursuant to 29 U.S.C. § 794(a), Plaintiffs are entitled to declaratory and injunctive relief and to reasonable attorneys' fees and costs incurred in bringing this action.

### Count II

### Violation of the Americans with Disabilities Act
### (42 U.S.C. § 12101, *et seq.*)

156.    Plaintiffs incorporate by reference each and every allegation contained in the foregoing paragraphs as if specifically alleged herein.

157.    Title II of the ADA states, in pertinent part:

> [N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or subjected to discrimination by any such entity. 42 U.S.C. § 12132.

158.    A "public entity" includes state and local governments, their agencies, and their instrumentalities. 42 U.S.C. § 12131(1).

159.    The Defendants were, at all times relevant to this action, and currently are "public entities" within the meaning of Title II of the ADA.

160.    Defendants provided and provide "services, programs [and] activities" including educational and extracurricular programs, services, and activities in their schools.

161.    The term "disability" includes physical and mental impairments that substantially limit one or more major life activities. 42 U.S.C. § 12102(2). A "'qualified individual with a disability' means an individual with a disability who, with or without reasonable modifications to rules, policies, or practices . . . meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2).

162.    Each of the named individual Plaintiffs, and all others similarly situated, were, at all times relevant to this action, and are currently "qualified individuals with disabilities" within the meaning of Title II of the ADA. They all have impairments that substantially limit a major life activity, and they all attend DOE schools and, thus, are qualified – with or without reasonable modification – to participate in the programs, services, and activities of the DOE.

163.    By failing to provide routine and necessary diabetes-related care to students in DOE schools in appropriate settings, Defendants have failed to provide Plaintiffs and members of the putative class equal access to their programs and services, in violation of Title II of the ADA and its implementing regulations. *See* 42 U.S.C. § 12134; 28 C.F.R. § 35.101 *et seq.*

164.    By failing to ensure that students with diabetes receive routine and necessary diabetes-related care in appropriate settings, the educational services that the DOE offers are not equal to or the educational services are not as effective in affording equal opportunity as those offered to non-disabled students. This conduct violates, among other provisions, 28 C.F.R. § 35.130(b)(1)(ii).

165.    Defendants fail to provide Plaintiffs and members of the putative class with educational services that are as effective as those educational services available to their non-disabled peers, and thus deny youth with disabilities equal opportunity: (1) to obtain the same result, (2) to gain the same benefit, and (3) to reach the same level of achievement as their non-disabled peers. Employing policies, practices, and procedures that regularly leave students with diabetes without diabetes-related care at the start of each school year, failing to individually assess whether routine and necessary diabetes-related care should be provided in students' classrooms and thereby unnecessarily forcing students to miss class time, failing to adequately train personnel, including teachers, paraprofessionals, and nurses to deliver routine diabetes-related care, and delaying the participation of or excluding students with diabetes from extracurricular and nonacademic activities does not constitute equal access to Defendants' education programs and services. As such, the educational services offered in DOE schools for students with diabetes are not sufficient to provide equal access to Defendants' education programs and services for Plaintiffs and members of the putative class. This conduct violates, among other provisions, 28 C.F.R. § 35.130(b)(1)(iii).

166.    Defendants fail to make reasonable modifications to their policies, practices, and procedures even though these modifications are necessary to avoid discriminating against Plaintiffs and members of the putative class, in violation of 28 C.F.R. § 35.130(b)(7).

167.    Specifically, Defendants fail to make reasonable modifications to their diabetes-related care policies and practices to ensure that students with diabetes have equal access to education. Such reasonable modifications may include, but not be limited to, allowing students with diabetes to receive diabetes-related care within the classroom as well as providing school

personnel trained in the provision of diabetes-related care in the classroom and during

nonacademic and extracurricular activities.

168.     Defendants use methods of administration that have the effect of subjecting

Plaintiffs and members of the putative class to discrimination by reason of their disability

because Defendants' policy and practice of failing to provide routine and necessary diabetes-

related care effectively denies students with disabilities in DOE schools services necessary for

them to achieve educational progress. As such, these methods of administration also have the

purpose and effect of defeating or substantially impairing accomplishments of the objectives of

Defendants' educational services in DOE schools with respect to Plaintiffs and members of the

putative class because these students with disabilities are denied equal access to education. This

conduct violates, among other provisions, 28 C.F.R. §§ 35.130(b)(3)(i) and (ii).

169.     By failing to individually assess whether routine and necessary diabetes-related

care, including the administration of insulin, blood glucose checks, and treating hyperglycemia

and hypoglycemia should be provided in students' classrooms and thereby unnecessarily forcing

students to miss class time for routine and necessary diabetes-related care, Defendants fail to

administer their services, programs, and activities in the most integrated setting appropriate to

the needs of students with diabetes. 28 C.F.R. § 35.130(d). Further, Defendants fail to ensure that

their safety requirements, including but not limited to policies, practices, and procedures that

force students to leave the classroom for routine and necessary diabetes-related care, are based

on actual risks, not on mere speculation, stereotypes, or generalizations about individuals with

disabilities. 28 C.F.R. § 35.130(h).

170.     Because Defendants' discriminatory and wrongful conduct is ongoing,

declaratory and injunctive relief are appropriate remedies. Further, as a direct result of

Defendants' actions, Plaintiffs and members of the putative class are suffering irreparable harm, including lost education opportunities. Therefore, speedy and immediate relief is appropriate.

171.    Pursuant to 42 U.S.C. § 12133, Plaintiffs are entitled to declaratory and injunctive relief as well as reasonable attorneys' fees and costs incurred in bringing this action under 42 U.S.C. § 12205.

### Count III

**Violation of the New York City Human Rights Law**
**(N.Y.C. Admin. Code § 8-101, *et seq.*)**

172.    Plaintiffs incorporate by reference each and every allegation contained in the foregoing paragraphs as if specifically alleged herein.

173.    NYCHRL provides that "[i]t shall be an unlawful discriminatory practice for any person, being the owner, lessee, proprietor, manager, superintendent, agent or employee or any place or provider of public accommodation because of the actual or perceived . . . disability . . . status of any person directly or indirectly, to refuse, withhold from or deny to such person any of the accommodations, advantages, facilities or privileges thereof . . . ." N.Y.C. Admin. Code § 8-107(4)(a). Persons include all "natural persons, proprietorship, partnerships, associations, group associations, organizations, governmental bodies or agencies, corporations [and] legal representatives . . . ." N.Y.C. Admin. Code § 8-102(1).

174.    Further, the term "place or provider of public accommodation" encompasses "providers, whether licensed or unlicensed, of goods, services, facilities, accommodations, advantages or privileges of any kind, and places, whether licensed or unlicensed, where goods, services, facilities, accommodations, advantages or privileges of any kind are extended, offered, sold or otherwise made available." N.Y.C. Admin. Code § 8-102(9).

175.     Educational institutions, defined as "kindergartens, primary and secondary schools, academies . . . and all other educational facilities," like those operated by Defendants, are contemplated within the definition of public accommodations in the NYCHRL. N.Y.C. Admin. Code § 8-102(8). Public education services constitute a service, accommodation, advantage, or privilege that is offered to the general public within the meaning of N.Y.C. Admin. Code § 8-102(9). Defendants NYC DOE and Carranza, DOHMH and Barbot, as well as OSH and Platt, are "managers" of public agencies and as "governmental bodies or agencies" are plainly "persons" within N.Y.C. Admin. Code § 8-102(1).

176.     Through their failure to provide routine and necessary diabetes-related care in DOE public schools in appropriate settings and their exclusion of children with diabetes from various school activities, Defendants, in their role as "managers," violate § 8-107(4)(a) by denying to students with disabilities access to a service, accommodation, privilege, or advantage that is otherwise available to students without disabilities because students with diabetes need diabetes-related care to have access to education.

177.     In addition, Defendants violate N.Y.C. Admin. Code § 8-107(15). This provision mandates that covered entities must "make reasonable accommodation to enable a person with a disability to . . . enjoy the right or rights in question, provided that the disability is known or should have been known by the covered entity." N.Y.C. Admin. Code § 8-107(15). Because this provision applies to all entities that must comply with N.Y.C. Admin Code § 8-107, Defendants are bound by it.

178.     The provision of routine and necessary diabetes-related care is crucial to providing students with diabetes access to education on equal terms with students without disabilities. Moreover, Defendants are aware that these students have diabetes because of

43

communication with students' families and doctors, including the DMAF. Defendants' failure to ensure that these students receive mandated care is thus a violation of the § 8-107(15) reasonable accommodation mandate.

179.    These violations are particularly grave in light of the "uniquely remedial" purpose behind the NYCHRL. The construction provision of this law expressly provides that each section must be "construed liberally for the accomplishment of the uniquely broad and remedial purposes thereof, regardless of whether federal or New York State civil and human rights laws, including those laws with provisions comparably-worded to provisions of this title, have been so construed." N.Y.C. Admin. Code § 8-130. Accordingly, Defendants' conduct is subject to a much stricter standard than under state or federal law, and their liability under these provisions must be determined separately and independently from their liability under the disability provisions of either state or federal civil rights law.

180.    As a direct and proximate result of Defendants' violations of the NYCHRL, Plaintiffs have been injured as set forth herein.

181.    Defendants' conduct constitutes an ongoing and continuous violation of the NYCHRL. Unless Defendants are enjoined from further violations, Plaintiffs will continue to suffer injuries for which there is no adequate remedy at law. In particular, Plaintiffs will suffer irreparable harm in that they will continue to be discriminated against and denied the accommodations, advantages, facilities, or privileges of DOE public schools, as well as reasonable accommodations that would provide them the opportunity to benefit from them. Plaintiffs are accordingly entitled to injunctive relief and reasonable attorneys' fees and costs.

Wherefore, Plaintiffs pray for relief as set forth below.

## Count IV

### Declaratory Relief

182.     Plaintiffs re-allege and incorporate herein all previously alleged paragraphs in this Complaint.

183.     Plaintiffs contend that Defendants have failed and are failing to comply with applicable laws prohibiting discrimination against students with disabilities in violation of Section 504, 29 U.S.C. § 794, and accompanying regulations; the ADA, 42 U.S.C. § 12101 *et seq.*, and accompanying regulations; and the NYCHRL, N.Y.C. Admin. Code § 8-101 *et seq.*, and accompanying regulations.

184.     Defendants disagree with Plaintiffs' contention.

185.     A judicial declaration is necessary and appropriate at this time in order that each of the parties may know their respective rights and duties and act accordingly.

Wherefore, Plaintiffs pray for relief as set forth below.

### PRAYER FOR RELIEF

Wherefore, Plaintiffs, individually and on behalf of the class they represent, ask the Court to:

186.     Order that Plaintiffs may maintain this action as a class action pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure;

187.     Order and declare that the Defendants' conduct as alleged herein has violated, and continues to violate, Section 504, 29 U.S.C. § 794, and accompanying regulations; the ADA, 42 U.S.C. § 12101 *et seq.*, and accompanying regulations; and the NYCHRL, N.Y.C. Admin. Code § 8-101 *et seq.*, and accompanying regulations;

188.     Preliminarily and permanently enjoin Defendants from violating Section 504, 29 U.S.C. § 794, and accompanying regulations; the ADA, 42 U.S.C. § 12101 *et seq.*, and

accompanying regulations; and the NYCHRL, N.Y.C. Admin. Code § 8-101 *et seq.*, and accompanying regulations;

189.    Order Defendants to alter their systemic policies, procedures, and practices regarding the provision of diabetes-related care to ensure that Plaintiffs and the members of the putative class receive FAPE and equal access to education for all students with diabetes attending DOE public schools in compliance with all laws that protect such students;

190.    Order Defendants to develop and implement a remedial plan that includes new systemic policies, practices, and procedures to ensure that all students in the putative class receive routine and necessary diabetes-related care from adequately trained staff in the most integrated setting appropriate for educational and other school-related activities before, during, and after the school day;

191.    Retain jurisdiction of this case until Defendants have complied with the orders of this Court, and there is a reasonable assurance that Defendants will continue to comply in the future, absent continuing jurisdiction;

192.    Award attorneys' fees and costs, as provided by statute and law; and

193.    Any such other relief as the Court finds just and proper.

Dated:  November 1, 2018            Respectfully submitted,
        New York, New York            DISABILITY RIGHTS ADVOCATES

_____

Michelle Caiola
Seth Packrone
Torie Atkinson
DISABILITY RIGHTS ADVOCATES
655 Third Avenue, 14th Floor
New York, NY 10017
Tel: (212) 644-8644
Fax: (212) 644-8636
mcaiola@dralegal.org
spackrone@dralegal.org
tatkinson@dralegal.org

_____

Sarah Fech-Baughman (pro hac vice motion to be filed)
AMERICAN DIABETES ASSOCIATION
2451 Crystal Drive, Suite 900
Arlington, VA 22202
Tel: (703) 253-4823
sfech@diabetes.org

_____

Alan L. Yatvin (pro hac vice motion to be filed)
POPPER & YATVIN
230 S. Broad St., Suite 503
Philadelphia, PA 19102
Tel: (215) 546-5700
Fax: (215) 546-5701
Popper.yatvin@verizon.net